No. 100.—CURTIS LEARY, plaintiff in error, *vs.* MARIA LEARY, defendant in error.

[1.] In an action for divorce, brought by a husband against his wife, a tender and suspicious solicitude on the part of the wife, when in attendance on the sick bed of a gentleman not her husband, may be proven by her conduct as well as by her conversation. If such solicitude be manifested by conversation, however, the witness should give such conversation, or its substance.

[2.] Though a set of interrogatories be improperly rejected, on account of exceptions taken to a question as leading, yet, if another set be sued out, and the evidence desired be submitted to the Jury, and no harm is done by the rejection of the first set, this Court will not reverse the judgment.

[3.] Where amatory letters were written by one to the wife of another, which letters were drawn out by other letters written in the name of his wife, and

sent by the husband to the former, without any knowledge, on the part of the wife, that such letters had been written; and where evidence was offered to show that the person thus duped had proceeded to comply with an assignation proposed in one of these letters, and had repaired to the vicinity of the wife's residence, but without the knowledge of the wife, and without seeing her : *Held*, that these circumstances were not evidence against the wife, in an action for divorce, brought by the husband.

[4.] Declarations made by a person suspected of having criminal intercourse with the wife of another, that he had had such intercourse, but which were not made in the presence of the wife, and in no manner sanctioned by her, cannot be admitted as evidence against her.

[5.] In an action for divorce brought by a husband, it may be proper for him to offer proof to the effect, that he did not know any thing of the report as to his wife's improper intimacy with another man, until some time after it had been put into circulation in the neighborhood.

[6.] So, the fact that the husband had acted promptly in discharging from his employment, and sending from his house, the person accused as an accomplice with his wife, might be of some signification to show that he had not afforded encouragement to such intercourse, but had acted as a prudent husband should under the circumstances.

[7.] It is error in the Judge to sum up and refer to the facts relied upon by one party, to make out his case, and altogether omit any reference to circumstances in proof relied upon by the opposite party.

Divorce, in Houston Superior Court.   Tried before Judge WORRELL, May Term, 1855.

This was a libel for divorce, filed by Curtis Leary against his wife, Maria Leary.

The declaration alleged that the defendant, in the latter part of the year 1852, was guilty of adultery with one Samuel G. Logan.

The defendant, in her plea, denied the charge of adultery, and pleaded condonation on the part of the plaintiff.

On the trial, plaintiff tendered in evidence the depositions of Mrs. Mary Lawson, in substance, "that she was acquainted with Samuel G. Logan and Mrs. Leary; and that she had observed, that Mrs. Leary manifested an unusual interest and sympathy for Logan when he was sick, at the house of Mrs.

Leary." To this evidence, defendant objected. The Court sustained the objection, and plaintiff excepted.

Plaintiff then offered in evidence the testimony of Mrs. Mary Marchman, taken by interrogatories.

The following part of the 2nd interrogatory was objected to, because it was leading: "Do you or do you not know of any letters having been received by your father from Logan, who lived at Leary's in 1852, at any time since he left the employment of Leary; if so, did or did you not read that letter or letters? And if you read it or them, please to say where that letter is or those letters are; if destroyed, please state the contents—why destroyed—was or was not the names of Mrs. Leary and Mr. Leary mentioned in the letter—how and in what terms were they mentioned—did or did not the letters ever contain any message to Mrs. Leary? If it did, was it or not delivered; was or was not the letter read to Mrs. Leary; did or did not Mrs. Leary ever request you to write a letter for her to said Logan?"

The Court sustained the objection to the interrogatory and excluded the answer, and plaintiff excepted.

Plaintiff then offered to read in evidence the depositions of Ichabod H. Albertson. To the interrogatories were attached two letters purporting to be written by Samuel G. Logan to Mrs. Leary, one dated "Starkville, June 2d, 1853; the other dated Starkville, Sept. 30th, 1853." These letters were written in reply to letters received by Logan, purporting to have been written by Mrs. Leary. They were full of amatory expressions, and designated places at which he requested Mrs. Leary to meet him, &c.

The evidence of the witness went to show that the letters of Logan were written in reply to letters written and addressed to him (Logan) by Mr. Leary, in the name of his wife. The witness also states that he was at the house of Mr. Leary on the night of October 8th, 1853, the night named in the first letter of Logan to Mrs. Leary, as the time when he requested her to meet him privately; that he was there at the request of Leary to help him to watch; that during the night,.

about 12 o'clock, they discovered some person secreted in the garden; that some one shot off a gun from inside of the garden, &c. &c. He believes that Samuel G. Logan was there." The letters received by Mr. Leary from Logan, in reply to those written to him in the name of Mrs. Leary, were taken from the post-office by the witness, at the request of Mr. Leary, and were never seen by Mrs. Leary."

To this evidence defendant objected. The Court sustained the objection, and plaintiff excepted.

The plaintiff then introduced N. J. Sandlin, who testified that "some time in the fall of 1853, a few days after the night of the shooting, Mrs. Leary came to his bed in the house of Curtis Leary, and requested him to get up and hear her talk to Mr. Leary and persuade him to talk to her; that she was not satisfied with the way they were living; that Mr. Leary refused to sleep with her; and she complained of it, as the nights were cold. Witness got up and went with her; she tried to get Mr. Leary to talk the matter over. He said it was no use. She asked him to forgive her, and asked if he could not forgive her, if she would get down on her knees and confess that the charge was true and ask his pardon. He said it was too late, and he could not forgive her. She denied that she was guilty," &c. &c.

Plaintiff then proposed to prove by Stephen Brown, that Mr. Leary did not know of the report of the intimacy between Logan and Mrs. Leary, until some months after it was in circulation. Objection being made, the Court excluded the evidence, and plaintiff excepted.

Plaintiff then proposed to prove by Thomas Judge, that Leary was first told by witness of the report about Logan and Mrs. Leary being too intimate, in a quarrel witness and Leary had in January, 1853. Which, on motion, was excluded by the Court, and plaintiff excepted.

There was much other testimony offered, and some admitted, which it is unnecessary here to set forth.

Among other things, the Court charged the Jury—

" If the proof shows that the defendant is guilty, and that

the plaintiff knowing it afterwards, lived with her in the same house, under the same roof, that they slept in the same room; that the defendant looked after the domestic matters of the family; took care of the children, and attended to their wants; sat at the table with the plaintiff, and waited upon him; used the plaintiff's horses and carriage in visiting her friends and neighbors; I say, if the proof shows these things, or the like, from them, the Jury may infer forgiveness on the part of the plaintiff."

To which charge of the Court, plaintiff excepted; and upon these several exceptions, errors have been assigned.

GIBSON; WARREN, for plaintiff in error.

SCARBOROUGH; MILLER & HALL, for defendant in error.

*By the Court.*—STARNES, J. delivering the opinion.

[1.] The first objection is to the decision of the Court below in excluding the depositions of Mrs. Lawson.

This objection was put upon the ground that the testimony was irrelevant. And it has been argued that it was so, because the conversations between Mrs. Leary and Mr. Logan were not given by the witness; and that these are the best evidence of any solicitude which may have been manifested.

It is not denied, we believe, that such solicitude or tender interest might be shown in such a case, without proof of any conversations whatever, as would serve to indicate more than a mere friendly or charitable purpose, in the ministrations of a married lady, at the sick bed of a gentleman not her husband. In our opinion, such suspicious solicitude might be evinced, either by what was said by the lady, or by her demeanor, or by both together. If it were, in the opinion of the witness, manifested, either in the first or the latter way, the conversations should be given if possible. If the witness does not recollect the words used, he may give the impression left upon his mind, as to the substance and effect. The opin-

ion formed by Mrs. Lawson, (the witness in this case,) we think, from what she says, rested both on the conversation and the conduct of Mrs. Leary. But she states that she does not recollect the conversation. She gives, therefore, only the result which it and the anxious manner of Mrs. Leary produced upon her mind.

It is every day's practice to receive testimony of *emotions*, as they are manifested by the behavior and bearing of parties. Fear, apprehension, surprise, anger, anxiety, content, satisfaction and dissatisfaction, are thus constantly proven. And the experience of all men sanctions the practice.

We do not wish to be understood as intimating that these depositions really do show that a tender solicitude for Mr. Logan was manifested by Mrs. Leary. Her conduct, perhaps, may be explained by attributing her anxiety and attentions to her charity and hospitable kindness. But this is for the Jury to decide. And we only mean to say that we think these depositions should have been, for this purpose, submitted to them.

[2.] The point next made was, that the Court erred in holding that there was a leading question in a set of interrogatories addressed to Mrs. Marchman; and consequently, excluding them.

We have not examined this interrogatory very closely, but we incline to think that the question, as it comes to us in the record, is not leading. But this is immaterial, as the testimony was obtained by another set of interrogatories, was submitted to the Jury, and no harm was done by the rejection of the first set.

The Act of the last Legislature regulating the granting of new trials, does not affect this view of the subject. We have repeatedly decided that that Act applies only to cases where a motion for a new trial has been made in the Superior Court.

[3.] We think the Court ruled rightly in excluding the testimony of Ichabod H. Albertson.

The circumstances stated by him were in no wise connected with Mrs. Leary. They were *res inter alios acta.* And very

curious things they were which were acted in the comedy to which he testifies. The pen of the humorous dramatist might find some useful hints in his story, from which could be gathered abundant *material* for a comedy of the " Jealous Husband," in the retirement of the country.

By no rule of evidence can the letters spoken of by this witness, and exhibited in connection with his testimony, be connected with Mrs. Leary. It is impossible to say but that the amatory effusions of the duped Mr. Logan, (if it be not injustice to call things *amatory* which remind one so much of the ass's efforts to imitate the lap-dog,) may have been provoked by the seducing epistles in which the husband was representing his own wife as being so sweet upon the dupe, and by the lock of hair which was a part of the contents of one of these letters. It is difficult to say how much these things may have drawn forth from the amarous swain of his rude and salacious demonstrations. It will not do, therefore, to carry these last to the account of previous criminal relations between him and Mrs. Leary, and to infer from them the foregone conclusion which they are offered to demonstrate. Besides, testimony of this sort, obtained in this way by a husband, can never be regarded as competent evidence, even if it did authorize such a conclusion.

If the letters were not proper evidence; and what transpired on the night of the 8th of October, as detailed by Albertson was not evidence, the fact of the witness, Valentine, having met Logan about this time, returning from Houston, for similar reasons, is not proper evidence.

[4.] For a similar reason, too, we think that the declarations which, it was said, were made by Logan, as to his having had criminal intercourse with Mrs. Leary, were not proper evidence. She was not present, did not hear them, and there is no evidence that they were ever brought to her knowledge. And, for anything that the record shows of her connection with these declarations, they may be base slanders.

It would be a most mischievous rule, indeed, which would

Leary *vs.* Leary.

admit such statements, unsupported by any recognition of their truth on the part of the person whom they accuse. It would be to place the reputation of every lady at the mercy of any foul-mouthed reprobate, who, casting upon her a lustful eye, might falsely seek to sully her reputation.

[5.] As to the statement of Stephen Brown, we are of opinion that it was not proper evidence, presented as this record shows it was. Yet, we think that it was competent for this witness to prove, if he could do so, by any circumstances within his knowledge, that the plaintiff in error did not know anything of the report, as to a suspicious intimacy between Logan and his wife, until sometime after it had been put into circulation in the neighborhood; thus, to rebut any inference to his prejudice which might be denied from his apparent delay in discharging Logan.

[6.] We think the exception well taken as to the rejection of Thomas Judge's testimony, to the effect that he had informed the plaintiff in error of this report, as to his wife's intimacy with Logan. We are of opinion that this circumstance, taken in connection with the discharge of Logan by him, and sending him from his house, might be looked to, perhaps, as evidence that he had acted promptly, in this behalf, and as a prudent husband should, under the circumstances, after he had received this information, and had not afforded encouragement to such criminal intercourse, if the Jury should find that it had existed.

[7.] Upon the subject of condonation, we think the Court erred in his instruction to the Jury, by summing up and referring to the facts relied upon by the defendant as showing such condonation, and altogether omitting any reference to the circumstances which had been relied on, as proving the contrary. We have more than once disapproved of this mode of charging a Jury.

Let the judgment be reversed.